PRESENT:  All the Justices

H. CURTISS MARTIN, ET AL.
                                        OPINION BY
v.  Record No. 121526      JUSTICE ELIZABETH A. McCLANAHAN
                                        JUNE 6, 2013
CITY OF ALEXANDRIA, ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
J. Howe Brown, Judge

H. Curtiss Martin and Virginia Drewry (Martin) appeal from the circuit court's judgment upholding the decision of the Board of Zoning Appeals of the City of Alexandria (BZA) granting side and rear yard variances to James and Christine Garner (Garners). Because the BZA's decision was contrary to law, we conclude the circuit court erred.

## I.  BACKGROUND

The Garners seek side and rear yard variances in connection with a proposed design of a single family home on their property located at 122 Prince Street in the City of Alexandria.  The property has 36 feet of frontage along Prince Street and is 44.33 feet deep.  It is zoned RM and is required to have two five-foot side yards and a 16-foot rear yard under the Zoning Ordinance of the City of Alexandria (Zoning Ordinance).  See Zoning Ordinance §§ 3-1108(C)(1), 3-1106(A)(3)(a).  Located on the 100 block of Prince Street known as "Captain's Row," the property is also subject to the Zoning Ordinance requirements for the Old and Historic Alexandria District (Historic District

Ordinance). The Historic District Ordinance requires the issuance of a certificate of appropriateness from the Old and Historic Alexandria District Board of Architectural Review (BAR) for new construction.[1]

Adjoining the Garners' property on the east is the property owned by Martin, located at 118 Prince Street.[2] The home built on the property located at 126 Prince Street, which adjoins the Garners' property to the west, is one of the City's only remaining examples of late 18th century rough sawn wood used as siding. Preserving a view of this wall is a factor in the BAR's decision to issue a certificate of appropriateness for any home design the Garners might submit.

In 2003, the Garners applied for a side yard variance of five feet and a rear yard variance of 16 feet. City staff

---

[1] In passing upon the appropriateness of any "proposed construction, reconstruction, alteration or restoration of buildings or structures," the BAR shall consider numerous features and factors including the "height, mass and scale of buildings or structures," "the impact upon the historic setting, streetscape or environs," and "the extent to which the building or structure will preserve or protect historic places and areas of historic interests in the city." Historic District Ordinance § 10-105(A)(2)(a),(c),(e).

[2] An eight-foot wide alley separates the properties owned by the Garners and Martin, who are parties to proceedings initiated by the Garners to determine title to the alley. See Martin v. Garner, ___ Va. ___, ___ S.E.2d ___ (2013) (this day decided). For the purposes of the current BZA application, the Garners have agreed that their side yard is calculated without regard to any portion of the alley.

2

recommended denial of the application based on its opinion that the strict application of the Zoning Ordinance would not result in undue hardship to the property. According to the staff analysis, "[t]he lot is level and there is no condition of the lot which restricts the reasonable use or development of a new single-family dwelling." Further, City staff noted "[t]he lot is a large buildable lot that can be developed without the need of a variance. The lot's characteristics are similar to other lots within this section of Prince Street." In addition, City staff explained that "[g]ranting the variance will be detrimental to the adjacent property to the east [Martin's property]" because the neighbor "will now view 44.3 feet of building wall." The City deferred action on the Garners' application pursuant to the Garners' request due to ongoing legal issues pertaining to the title to the alley running between the Garners' and Martin's properties.

In 2005, the Garners applied for a side yard variance of five feet and a rear yard variance of 14 feet. City staff again recommended denial of the application because "[t]here is no justification for hardship." According to the staff analysis, "[a] new house (23 feet wide facing Prince Street by 28 feet deep by three-stories) can be constructed on this property in compliance with the east side and rear yard setbacks."

3

Although the lot is less than half the depth (44.33 feet) compared to the standard Old Town lot of 100 feet deep it is twice as wide as the minimum lot width required for an RM zoned lot. The wider lot does compensate for the loss of lot depth, but does not limit the placement of a new house on the lot. The placement of the new house is located in compliance with the zoning rules from the west side property line to maintain open space, respect the historic wall at 126 Prince Street and maintain views of Prince Street for the neighbors directly behind the applicants at 130 South Lee Street. The BAR will require the new house to not impede the view nor allow a new structure that could effect the historic wood wall on the east side of the house at 126 Prince Street.

By shifting the new house west by another 4.00 feet from the western edge of the private alley to address the east side yard setback will still provide 8.00 feet of distance from the historic wall at 126 Prince Street. No side yard variance will be needed.

City staff also stated that "[t]he property is not unique to support the placement of the house closer to the rear property line than the minimum of 16.00 feet" and a "two-story house at 126 Prince Street west of the subject property is built on a similar size lot . . . but is located almost 16.00 feet from the rear yard property line as required by the zoning code." After a BZA hearing on the application, the Garners withdrew their 2005 application.

Subsequent to their 2003 and 2005 variance applications, the Garners sought a determination from the Zoning Administrator that they could utilize a portion of the abutting alley to calculate their east side yard. After the Zoning Administrator determined the alley could not be counted toward the side yard,

4

the Garners appealed this decision to the BZA, which affirmed the decision of the Zoning Administrator. The Garners appealed the BZA's decision to the circuit court. Prior to trial, the Garners and the City entered into a "Stay of Litigation Agreement" in which the City agreed that its Department of Planning and Zoning will support the Garners' application for a three-foot side yard variance, to be measured without regard to their claim of ownership of the alley, in consideration of the Garners' agreement to stay the litigation.

In 2011, the Garners submitted the current application seeking a three-foot side yard variance and a 13-foot rear yard variance. The design for the proposed home was submitted to the BAR which approved the Garners' application for a certificate of appropriateness. In connection with the Garners' variance application, the Historic Preservation Manager, Al Cox, submitted a memo to the BZA relaying the BAR's decision on the design of the home proposed by the Garners. Cox stated that the BAR "found the height, mass, scale and architectural style to be appropriate for the historic character of the block" and "the general design and arrangement of the building on the east side of the site adjacent to the alley was consistent with the historic setting, streetscape, and environs" following "the historic development patterns in the [Historic District]."

At the BZA hearing on the Garners' variance application, the BZA received the report of the City staff describing the proposed house as a "two-and-one-half story, three-bay, brick townhouse in a late Federal architectural style" to be "located on the front property line facing Prince Street, 2.00 feet from the west edge of the private alley, 11.00 feet from the west side property line and 3.00 feet from the rear property line." Thus, a "variance of 3.00 feet from the west edge of the private alley and 13.00 feet from the rear property line is required." Noting that "Captain's Row is an especially important street in Alexandria," City staff supported the two variances "not only because the result is a good development compatible with its historic context, but also because the applicants' case meets the legal standards for the grant of a variance."

In particular, staff stated that because this application concerns "a new house in Old Town and on the 100 block of Prince Street," it is unique since "[t]he zoning regulations and requirements in the Old and Historic District are designed to apply to old buildings." (Emphasis in original.) According to staff, "the RM zone regulations . . . are especially intended to apply to additions to historic buildings, and are rarely used for new houses on vacant lots." In addition, the Garners' lot is shallower than two-thirds of the other lots on Captain's Row.

6

In its report, City staff stated that having two five-foot side yards "would actually call more attention to the proposed house because it would appear to be the only single family detached house on a block of row houses" and the proposed location "will maintain the historic sense of open space immediately adjacent to 126 and 130 Prince Street and allow the historic rough sawn siding on that east wall to be clearly visible." Staff supported the rear yard variance because "it is far preferable to have the public view of a house with a narrower, more historically appropriate width and depth, than a shallow house with an architecturally grand, four-bay wide frontage." According to staff, "[i]f the house were modified to meet both zoning and BAR requirements, it would be very small relative to the other houses on the block. While the RM zone provides for such dimensions, it was not designed primarily for the construction of new houses."

In the Garners' application and at the hearing before the BZA, they advanced four primary factors justifying the variances. First, the Garners asserted that their property is the only vacant buildable lot on the 100 block of Prince Street. Second, they pointed out that their property is wider and more shallow than most of the other lots in the RM zone. Third, they noted that their property is adjacent to the historic siding on the home located at 126 Prince Street. Finally, they argued

7

that these factors, in combination with the enforcement of the RM zoning regulations and the Historic District Ordinance would amount to a clearly demonstrable hardship. The Garners contended they "cannot build a house with two side yard setbacks and a sizeable rear yard without resulting in an atypical footprint from other houses located in the historic block of Prince Street." According to the Garners, "[t]he BAR confirmed this in their deliberations and approval of a certificate of appropriateness for the proposed home on the lot."

At the hearing, opponents of the variances pointed out to the BZA that the City staff had submitted a home design that conformed to the Zoning Ordinance and that could be built on the Garners' property. Neither this design, nor any other design conforming to the requirements of the Zoning Ordinance, however, was submitted by the Garners to the BAR for a certificate of appropriateness. At the conclusion of the hearing, the BZA voted to approve the application. Martin appealed the decision of the BZA to the circuit court, which upheld it.[3]

---

[3] Martin initially filed a "Petition for Writ of Certiorari" pursuant to Code § 15.2-2314 serving the City Attorney as counsel for the City of Alexandria and the City Council for the City of Alexandria. In response, the City Council filed a motion to quash the petition and demurrer asserting that the correct basis for Martin's appeal was the City of Alexandria Charter (City Charter) § 9.20 under which the circuit court is not required to issue a writ of certiorari and the governing

8

II.  ANALYSIS

A.  City Charter Provisions

The Alexandria City Charter (City Charter) governs appeals from the BZA.  It provides that the circuit court "may reverse or modify the decision reviewed . . . when it is satisfied that the decision of the board is contrary to law or that its decision is arbitrary and constitutes an abuse of discretion."  City Charter § 9.21.  Applying this standard, which is also contained in the Code, we have stated:

> "A proceeding before the trial court under Code § 15.1-497 [the predecessor to § 15.2-2314] is not a trial de novo. There is a presumption that the Board's decision was correct and the burden is on the appellant to overcome this presumption.  The court may not disturb the decision of a board of zoning appeals unless the board has applied erroneous principles of law or, where the board's discretion is involved, unless the evidence proves to the satisfaction of the court that the decision is plainly wrong and in violation of the purpose and intent of the zoning ordinance."

Riles v. Board of Zoning Appeals, 246 Va. 48, 51, 431 S.E.2d 282, 284 (1993) (quoting Alleghany Enterprises, Inc. v. Board of Zoning Appeals, 217 Va. 64, 67, 225 S.E.2d 383, 385 (1976)) (citations omitted).  "[A]ny arbitrary or unreasonable action,

_____

body of the City is not a necessary party.  Thereafter, Martin filed an "Amended Petition for Appeal" and the parties agreed that the proper party to the appeal under the Charter was the City.  Pursuant to the agreement, the circuit court entered a consent order dismissing the City Council as a party.

9

contrary to the terms or spirit of the zoning law, or contrary to or unsupported by facts, [i]s an illegal action" by a board of zoning appeals. Hopkins v. O'Meara, 197 Va. 202, 205, 89 S.E.2d 1, 3 (1955) (citing Anderson v. Jester, 221 N.W. 354, 359 (Iowa 1928)).

The City Charter defines the powers of the BZA and provides that the BZA may authorize a variance "when, owing to special conditions a literal enforcement of the provisions will result in unnecessary hardship; provided that the spirit of the ordinance shall be observed and substantial justice done," upon the property owner's showing of at least one of the following conditions and one of the following justifications:

> When a property owner can show that his property was acquired in good faith and where by reason of the exceptional narrowness, shallowness, size or shape of a specific piece of property at the time of the effective date of the ordinance, or where by reason of the exceptional topographical condition or other extraordinary situation, or condition of such piece of property, or of the use or development of property immediately adjacent thereto, the strict application of the terms of the ordinance would effectively prohibit or unreasonably restrict the use of property or where the board is satisfied, upon the evidence heard by it, that the granting of such variance will alleviate a clearly demonstrable hardship,[4] as

---

[4] Code § 15.2-2309(2), which contains virtually identical language, and the City Charter previously permitted a BZA to grant a variance only where it would "alleviate a clearly demonstrable hardship approaching confiscation." See Former Code § 15.2-2309(2) (2008) (emphasis added). In 2009, the General Assembly removed "approaching confiscation," from the

10

distinguished from a special privilege or convenience sought by the applicant, provided that all variances shall be in harmony with the intended spirit and purpose of the ordinance.

City Charter § 9.18(b).

"[N]ot only must an applicant show the existence of at least one of [these] several 'special conditions' which would cause compliance with a zoning ordinance to result in an 'unnecessary hardship', but the board of zoning appeals must find that the [following] three enumerated tests are satisfied." Packer v. Hornsby, 221 Va. 117, 121, 267 S.E.2d 140, 142 (1980) (citing Tidewater Utilities v. Norfolk, 208 Va. 705, 711, 160 S.E.2d 799, 803 (1968)); Board of Zoning Appeals v. Nowak, 227 Va. 201, 204-05, 315 S.E.2d 221, 223 (1984). Specifically, the BZA must find:

(1) That the strict application of the ordinance would produce undue hardship.

(2) That such hardship is not shared generally by other properties in the same zone and the same vicinity and is not created by the owner of such property.

(3) That the authorization of such variance will not

---

statewide statutory provision, 2009 Acts ch. 206, and the same change was implemented by the Legislature in an amendment to the City Charter the following year. 2010 Acts ch. 221. City staff relied, in part, upon the elimination of this language to justify its change in position regarding the Garners' request for the variances.

> be of substantial detriment to adjacent property and
> that the character of the zone will not be changed by
> the granting of the variance.

City Charter § 9.18(b).[5]  Finally, the City Charter provides

that

> [n]o variance shall be authorized unless the board
> finds that the condition or situation of the property
> concerned or the intended use of the property is not
> of so general or recurring a nature as to make
> reasonably practicable the formulation of a general
> regulation to be adopted as an amendment to the
> ordinance.

City Charter § 9.18(b).[6]

B.  Evidence to Support Variances

Noting that where the City Charter formerly required proof

of a "hardship approaching confiscation" it was amended to

require only a showing of a "clearly demonstrable hardship," the

Garners contend that the BZA may now authorize variances in

instances that previously were not authorized.  Their argument

ignores, however, the fact that the amendment did not alter the

remainder of Section 9.18(b) of the Charter, which "requires a

board of zoning appeals, prior to approving a variance, to make

certain findings of fact, which we deemed 'crucial'" in

discussing the analogous statewide statutory provisions in Code

---

[5] Code § 15.2-2309(2)'s three enumerated tests are the same, except that it does not require finding that the hardship "is not created by the owner of such property."

[6] Code § 15.2-2309(2) provides a similar limitation.

12

§ 15.2-2309.  <u>Hendrix v. Board of Zoning Appeals</u>, 222 Va. 57, 60, 278 S.E.2d 814, 816 (1981) (citing <u>Packer</u>, 221 Va. at 121, 267 S.E.2d at 142).

Thus, notwithstanding that the BZA need not find a hardship "approaching confiscation" to grant a variance, the BZA still must find that (i) "the strict application of the terms of the ordinance would effectively prohibit or unreasonably restrict the use of property," or "the granting of such variance will alleviate a clearly demonstrable hardship, as distinguished from a special privilege or convenience;" (ii) "all variances [are] in harmony with the intended spirit and purpose of the ordinance;" (iii) "the strict application of the ordinance would produce an undue hardship;" (iv) the "hardship is not shared generally by other properties in the same zone and the same vicinity;" and (v) "the condition or situation of the property . . . is not of so general or recurring a nature as to make reasonably practicable the formulation of a general regulation to be adopted as an amendment to the ordinance." City Charter § 9.18(b).

We review the Garners' four primary justifications for the variances and whether the BZA could properly have found them to satisfy all of the requirements of section 9.18(b) of the City Charter.

## 1. Condition of Lot Being Vacant in a District Where Most Surrounding Properties Are Already Developed

The Garners first argue that they face a unique hardship because they seek to build a new home on a vacant lot subject to both the RM Zoning Ordinance and the Historic District Ordinance, where most of the surrounding properties are already developed.

Contrary to the repeated assertions made by City staff that "[t]he zoning regulations and requirements in the Old and Historic District are designed to apply to old buildings," the City's Zoning Ordinance was expressly intended to apply to new structures.  Zoning Ordinance § 1-200(B) ("All buildings and structures erected hereafter . . . shall be subject to all regulations of this ordinance.")  In fact, granting a variance because a property owner is erecting a new structure would render the Zoning Ordinance meaningless.  We have rejected interpretations of a statute that "would render the entire statute meaningless."  Stone v. Liberty Mut. Ins. Co., 253 Va. 12, 20, 478 S.E.2d 883, 887 (1996).[7]  Therefore, the decision of

_____

[7] Furthermore, since much of the City is already developed, any property owner could use this basis for requesting a variance.  The use of variances to resolve such a problem is prohibited "because the piecemeal granting of variances could 'ultimately nullify a zoning restriction throughout [a] zoning district.'"  Hendrix, 222 Va. at 61, 278 S.E.2d at 817 (quoting Packer, 221 Va. at 122-23, 267 S.E.2d at 143).

the BZA cannot be upheld on this ground.

2. Condition of Lot Being Shallow and Wide

The Garners next argue that a variance is justified because their lot is exceptionally wide and shallow as compared to other lots on the 100 block of Prince Street.  City staff reported that "[o]n the 100 block of Prince Street, two-thirds of the lots are deeper than the [Garners'] property."  The Garners' argument, therefore, is that they face a hardship because, when compared with other properties on the block, their relatively more shallow lot makes it difficult to build a home that satisfies the rear yard requirement.

We rejected a similar argument in Packer where "[t]he premise for the Board's decision was that the [applicants] should be entitled to build as close to the ocean as 'the average of the houses along this block.'"  221 Va. at 122, 267 S.E.2d at 143.  We held that

> [i]f, as the Board concluded, one owner of the property complying with a restriction should be allowed to conform his structure to neighboring nonconforming structures, then every such owner would be entitled to do so. A board of zoning appeals could, by granting variances piecemeal, ultimately nullify a zoning restriction throughout the zoning district. But the statute provides that "all variances shall be in harmony with the intended spirit and purpose of the ordinance."

Id. at 122-23, 267 S.E.2d at 143.

Likewise, the Garners' argument, if accepted, would justify

15

variances for the one-third of the properties that are even more shallow than the Garners' property, yet still conform to the zoning ordinance, resulting in the "granting [of] variances piecemeal" that would "ultimately nullify" the zoning ordinance requiring a rear yard, thereby conflicting with the "intended spirit and purpose of the ordinance." Id. Since the City Charter prohibited the BZA from issuing a variance not "in harmony with the intended spirit and purpose of the ordinance," the BZA's decision cannot be upheld on this ground. City Charter § 9.18(b).[8]

### 3. Condition of the Property as being Subject to Historic District Ordinance

Finally, the Garners contend that their property is "undevelopable" because alternative designs would not comply with both the Historic District Ordinance and the Zoning Ordinance.[9]

The BZA was presented with evidence that because the siding

---

[8] The BZA was also presented with evidence that around half of existing homes on the block did not have a rear yard (i.e., did not currently comply with the rear yard requirements) and that therefore it would be a hardship to require the Garners to comply with the rear yard ordinance. For the same reason, a variance on this ground could not be upheld.

[9] Because the Garners' third justification – the historic siding on the home adjacent to their property – relates to their claim of hardship resulting from being subject to both the Historic District Ordinance and Zoning Ordinance, we combine their third and fourth justifications for discussion.

of the home at 126 Prince Street is of historical value, the Garners' property is immediately adjacent to a property of extraordinary condition.  The Garners argue that because the BAR considers the visibility of the neighboring wall in deciding whether to approve any home design the Garners might propose, they face a unique challenge in creating a design that both satisfies the BAR and conforms to the RM Zoning Ordinance.

As the Garners admitted during the BZA hearing, they have the option of submitting to the BAR a conforming design that would not require variances, and they have not done so. Consequently, it is mere speculation that the BAR would not approve this design or any other design that conforms to the Zoning Ordinance.[10]  Thus, there was no factual support for the Garners' claim that their property, by being located next to the historic wall, makes it uniquely more difficult to build a structure that both satisfies the BAR and conforms to the RM zoning regulations.  Accordingly, the BZA's decision cannot be upheld on this ground.  See Hopkins, 197 Va. at 205, 89 S.E.2d

_____

[10] At the BZA hearing, Cox expressed the BAR's interest in a home that would preserve a view of the neighboring wall stating, "we feel pretty strongly, that's an important house" and "it's the only house that survived largely intact from the fire. . . . [W]e felt [the Garner home] should be as narrow as possible, as short as possible, as simple as possible."  But Cox did not state that the BAR would reject a by-right design, instead only indicating a general preference for a better view of the historic wall.

at 3 (action that is "unsupported by facts, [i]s an illegal action" by a board of zoning appeals).

Without support for that fundamental premise, the Garners' argument is instead simply that because it is difficult to both satisfy the BAR and comply with the RM zoning regulations, any design that the BAR approves should be granted the necessary variances. But all properties in the Old and Historic District are subject to both the RM zoning regulations and Historic District Ordinance. Under the Charter, the BZA may grant a variance only if it finds "that the condition or situation of the property concerned or the intended use of the property is not of so general or recurring a nature as to make reasonably practicable the formulation of a general regulation to be adopted as an amendment to the ordinance." City Charter § 9.18(b); see also Hendrix, 222 Va. at 60-61, 278 S.E.2d at 816 (holding that a variance was improper where a zoning ordinance "imposi[ng] . . . the off-street parking requirements was a problem shared by all property owners" in that area); Packer, 221 Va. at 121-22, 267 S.E.2d at 142 ("Proximity to the ocean is doubtless a 'privilege or convenience' coveted by every homeowner along the beach. But a zoning restriction upon that privilege does not constitute an 'unnecessary hardship' within the meaning of [the Code].")

In passing upon requests for variances, a board of

18

> zoning appeals exercises the limited function of insuring that a landowner does not suffer a severe hardship not generally shared by other property holders in the same district or vicinity. The power to resolve recurring zoning problems shared generally by those in the same district is vested in the legislative arm of the local governing body.

Hendrix, 222 Va. at 61, 278 S.E.2d at 817.

Because being subject to both sets of ordinances is a condition shared by every other property holder in the same zone, this condition was "of so general or recurring a nature as to make reasonably practicable the formulation of a general regulation to be adopted as an amendment to the ordinance." City Charter § 9.18(b); see Code § 15.2-2309. Moreover, authorization of the variance upon this ground would amount to a policy judgment that structures built in the Old and Historic District should only be subject to approval of the BAR and need not comply with the RM Zoning Ordinance and would, therefore, constitute an "'administrative infringement upon the legislative prerogatives of the local governing body.'" Hendrix, 222 Va. at 61, 278 S.E.2d at 817 (quoting Packer, 221 Va. at 123, 267 S.E.2d at 143).[11]

---

[11] The flaw in the Garners' argument is made apparent by their assertion that "in order for the Garners to build the home that the BAR found appropriate, they required the side and yard variances from the BZA." Not only did the Garners fail to seek approval from the BAR for a by-right design, their argument improperly assumes that the BZA has the authority to authorize a

19

### III.  CONCLUSION

In sum, none of the conditions asserted by the Garners to justify their application for a variance satisfied the requirements of City Charter § 9.18(b).  Accordingly, the decision of the BZA was contrary to law.  Therefore, we will reverse the judgment of the circuit court and enter final judgment for Martin.

<u>Reversed and final judgment.</u>

---

variance to allow applicants to "build the home" found appropriate by the BAR.